

U.S. Department of Justice

United States Attorney
Eastern District of New York

KDE:JPM/DEL

271 Cadman Plaza East
Brooklyn, New York 11201

October 26, 2021

By ECF and E-mail

The Honorable Cheryl L. Pollak
Chief United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Andrew Russo
             Criminal Docket No. 21-466 (ARR)

Dear Chief Judge Pollak:

      The government respectfully submits this letter in opposition to defendant Andrew Russo's sealed application for pretrial release dated October 21, 2021 ("Def. Motion").[1]  The defendant, who has been and remains the official boss of the Colombo crime family of La Cosa Nostra (the "Colombo crime family"), is a danger to the community as well as to victims and potential witnesses in this case.  The characterizations of the defendant's conduct in his Motion downplay the seriousness of the criminal organization and

---

[1] The government respectfully requests that a redacted version of this letter be filed publicly, sealing only the portions of this response that may reveal health information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") that has not otherwise been disclosed in the defendant's public filings.  See Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 445 (E.D.N.Y. 2016) ("Courts in this Circuit have repeatedly held that information protected by HIPAA is not subject to a First Amendment or common- law right of access and thus have sealed docket entries and redacted documents that contain such information."), vacated in part on other grounds, 676 F. App'x 51 (2d Cir. 2017).  Further, while the defendant's motion requests the sealing of his application in its entirety, the government opposes sealing such portions of the application that do not pertain to the defendant's health status and respectfully requests that the defendant be ordered to file a redacted version publicly.

his indisputable leadership role in it.[2] They also minimize the severity and actual harm caused by a years' long scheme by the Colombo crime family to extort, embezzle and launder money from a Queens-based labor union (the "Labor Union") and its associated health care trust fund (the "Health Fund"). Similarly, the statements about the defendant's health status do not warrant release. Rather, the Bureau of Prisons' current placement of the defendant in a nursing facility, without contact with other members of the Colombo crime family, is appropriate for both his medical care and ensuring the safety of the community. For the reasons set forth below, the Court should continue the permanent order of detention.

I.      Factual Background

On September 8, 2021, a grand jury in this district returned a 19-count indictment (the "Indictment") charging fourteen defendants, including eleven members and associates of the Colombo crime family, with labor racketeering, extortion, money laundering conspiracy and other offenses. The defendant Andrew Russo is charged in Count One of the Indictment with racketeering, in violation of 18 U.S.C. § 1962(c); Count Two with Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a); Count Three with Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a); Count Four with Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a); Count Five with attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a); Count Thirteen with money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); Count Fourteen with conspiracy to steal and embezzle health care benefit funds, in violation of 18 U.S.C. §§ 371, 664 and 669(a); Count Fifteen with health care fraud conspiracy, in violation of 18 U.S.C. §§ 1349 and 1347; and Count Sixteen with attempted health care fraud, in violation of 18 U.S.C. § 1347. On April 14, 2021, the defendant was arrested and arraigned remotely before the Honorable Taryn A. Merkl, United States Magistrate Judge. At the time, law enforcement officers took the defendant to a medical facility to obtain a "fit for confinement" assessment, after learning the defendant had been involved in a car accident in August 2021. The hospital assessed the defendant and discharged him. At the arraignment, the defendant, through counsel, consented to a permanent order of detention with leave to present a bail application.

A.      The Defendant's Leadership of the Colombo Crime Family

The government's investigation showed that Andrew Russo has been the official boss of the Colombo crime family since the death of Carmine Persico, Jr., in 2019. In that role, as he had long before done as the acting boss and street boss of the Colombo family, Russo met often with lower-level members of the organization, including its various captains, to oversee and promote the criminal affairs of the enterprise. Although the defendant's Motion says the government has "regurgitate[d]" information showing that Russo is the boss (Def. Motion at 6), defense counsel does not actually dispute the allegation. Nor do they fundamentally dispute that Russo has been the de facto and now official head of

---

[2] The following opposition includes transcripts of wire intercepts and these transcripts are partial, draft transcripts, which are subject to revision.

the organization for much of the period that its inducted members and associates have sought to extort and embezzle large sums from the Labor Union, Health Fund and their respective officials and employees.

Nor does defense counsel dispute that Russo has seven prior convictions, including racketeering, jury tampering and assault, or that his most recent conviction for racketeering conspiracy occurred within the past ten years.  See United States v. Russo, et al., Docket No. 11-CR-30 (KAM) (E.D.N.Y.).  In his prior prosecution, Russo was detained pending trial.  As the government said in that case, and as the evidence from this investigation again showed, Russo has never intended to give up his role in the Colombo family and will remain the boss until his death.  The fact is known widely within the organization and elsewhere, as consensual recording in this case showed when co-defendant and Colombo soldier Michael Uvino explained, "The problem is, that old man [i.e., Russo], he wanted to be boss his whole life, his cousin was there[3], so."

The government's investigation here again demonstrated the close oversight of lower members by Russo.  Russo principally managed operations through frequent consultation with consigliere and co-defendant Ralph DiMatteo, and through regular meetings with family captains at his home or at a bakery in Carle Place, New York.  In arranging to meet with other members, Russo spoke carefully, including using coded and cryptic conversations and frequently alternating between English and Italian; for example, on September 28, 2020, Russo and DiMatteo spoke and planned to meet:

| | |
|---|---|
| DIMATTEO: | Hey |
| RUSSO: | Hey, che fai? ["What are you doing?"] |
| DIMATTEO: | Come stai? ["How are you?"] |
| RUSSO: | Dove stai tu? ["Where are you?"] |
| DIMATTEO: | Brooklyn. |
| RUSSO: | Again, ti ho chiamato 'sta mattina.  Tu mai rispondi ["I called you this morning, you never answered."] |
| DIMATTEO: | I was out from earlier this morning, I, I was with you.  U telefono stava chiusu. ["The telephone was turned off."] You know what I mean? |

---

[3] Carmine Persico, Jr., who is Russo's cousin, was the longtime boss of the Colombo crime family until his death in 2019.

| | |
|---|---|
| RUSSO: | Yeah capisciu. Tu vieni ca ora?  Or no? ["I understand. Are you coming here now?"] |
| DIMATTEO: | No, domani mattina ["I'll go in the morning"] I'll be there nice and early, 10:00. |
| RUSSO: | Ok, alright. |
| DIMATTEO: | You alright with that? |
| RUSSO: | Yeah.  Tutte cose buone?  ["Everything okay?"] |
| DIMATTEO: | Yeah yeah everything's great. Yeah. |
| RUSSO: | (UI - voices overlap) |
| DIMMATEO: | No, no.  Ci ho lasciato ["I left ..."] ["You don't know"] he wanted me to but I had to run somewhere else. Mi capisci? ["You understand me?"] |
| RUSSO: | Whatever, alright. (UI) |
| DIMATTEO: | Parlamu domani mattin' ["We'll talk tomorrow morning."] |
| RUSSO: | Yeah, stasera non puoi venire? [You can't come tonight?]  Where are you now? |
| DIMATTEO: | I'll never make it. |
| RUSSO: | Ok, addio. Domani. ["Goodbye. Tomorrow."] |

This one conversation evidences a lucid Russo agreeing to meet with his consigliere and showed his capacity to engage and understand a cryptic conversation that included DiMatteo referencing having held a meeting where he needed to turn off his phone, an apparent effort to avoid government surveillance.  While the government also recorded instances where the defendant appeared forgetful at moments or was described as losing some of his cognitive abilities, the investigation also showed a man who could consistently follow details of events, provide directions about actions to take and continue to control the many inducted members below him who sought his counsel and took his orders.

   The defendant also associated with co-defendants, including heir apparent and co-defendant Theodore Persico, Jr.  For instance, on February 20, 2021, co-defendant and Colombo family captain Richard Ferrara, who was present with Russo, called Persico and placed Russo on the telephone:

4

| | |
|---|---|
| RUSSO: | Hey pal you remember me? |
| PERSICO: | I miss you unc. . . cousin I was gonna come and see you but I was afraid to come there because everybody was Jenna was sick and everything and I can't go home to Nicole- |
| RUSSO: | Oh yea well Jenna had it Jenna had it Jimmy had it you did the right thing but I'm not, I'd still like to hear from you we can meet other pla-, you know somewhere for cards. |
| PERSCIO: | [UI] |
| RUSSO: | I know you okay? |
| PERSICO: | Yea I'll come tomorrow morning maybe or I'll see you during the, I gotta come. |
| RUSSO: | Alright if you want I'll drive in a little bit |
| PERSICO: | Nah nah nah I'll either come tomorrow, or I'll see you during the week. I'll come find you during the week. |
| RUSSO: | Alright give me a day's notice, we'll make macaroni. |
| PERSICO: | No I don't need nothing like that don't worry about. |
| RUSSO: | How you feeling? How you feeling, how are you feeling? |
| PERSICO: | I'm good, how's everybody? |
| RUSSO: | I'm good we're good we're good. |

Again, the conversation revealed a defendant capable of planning to meet Persico (who was prohibited by the terms of his federal supervised release from contacting Russo). In late-March 2021, surveillance showed that Persico did travel to meet with Russo at his home on Long Island. On March 29, 2021, Persico and Ferrara were observed by law enforcement (and confirmed by GPS pings for Persico's phone) leaving Russo's residence in Glen Head at approximately 10:55 p.m. after a lengthy meeting.

    B.    <u>The Defendant's Management of the Labor Racketeering Schemes</u>

As is plain from the Indictment, detailed in the government's initial detention letter (ECF Dkt. No. 20), and further explained here, Russo has personally directed numerous facets of the extortion and embezzlement effort at the Labor Union and Health Fund, all of which shows Russo's command over the crime family and, therefore, his dangerousness. By

way of background, the Labor Union and Health Fund have been targeted for many years by the Colombo crime family as a source of illicit revenue. This, in part, stems from the significant involvement that members of the Colombo crime family formerly had in the operations of the Labor Union: Co-defendant Vincent Ricciardo started a predecessor labor organization that eventually merged with the Labor Union; Vincent Ricciardo's wife was formerly an employee of the Labor Union; and co-defendant and associate Domenick Ricciardo is also a former employee. Additionally, the Labor Union and Health Fund have also employed various members of other Colombo crime family members, including several relatives of another member in the Colombo crime family who is not charged in this case ("Colombo Member-1").

Based on expected witness testimony, Andrew Russo became directly involved in the Colombo family's handling of the Labor Union upon learning that a consultant to the Health Fund, who was related to Colombo Member-1, was not paying, or "kicking up" money from the Health Fund to the family's administration. Russo's expectation for payments has varied over time, and ranged from $4,000 per month to more than $10,000 per month. At one point, Russo even met directly with a consultant to determine how much money from the Health Fund could be siphoned by the Colombo crime family. Consensual recordings of co-defendant and Colombo family captain Vincent Ricciardo also repeatedly confirmed Russo's expectation for payments and dissatisfaction with payments by the consultant that Russo believed were too small. For instance, during a June 2021 meeting between Vincent Ricciardo and a cooperating witness (the "CW"), Ricciardo described a meeting he had attended where Russo (referred to as "the old man") had ripped up a check from the consultant, believing the amount of the payment to be insufficient.

| | |
|---|---|
| V. RICCIARDO: | The reason we get rid of the lawyer so they don't know what we're taking, that means the only way they could find out is through [John Doe #1], or his wife, and if they find out, then we know [John Doe #1] and his wife gotta go too, you gotta be careful here, last time he gave them a check for 5,000, they ripped it up. |
| CW: | Who did, [the consultant]? |
| V. RICCIARDO: | This guy. |
| CW: | [The consultant] gave em the check. |
| V. RICCIARDO: | Yea, for Christmas, then he made a deal with them for 4,000 a month. The old man ripped up the check, he did it in front of me, I saw him. But how long did the 4,000 last? Not much, five months? Six months? |

6

In this conversation, Vincent Ricciardo referred to the consultant trying to pay Russo $4,000 by check and Russo ripping up the check. He further referenced that the consultant had made payments over a longer period of time, which then stopped ("Not much, five months? Six months?").

Through consensual recordings of statements by co-conspirators, as well as expected witness testimony, Russo's involvement in this extortion scheme began in at least 2017. After the government's investigation here commenced in mid-2020, the government quickly developed direct evidence of Russo's continued, knowing involvement in the scheme. In October 2020, Russo became directly involved in mediating a dispute (or "beef") between Colombo family captains Vincent Ricciardo and Colombo Member-1. The dispute stemmed principally from Vincent Ricciardo's pressure on the Labor Union, Health Fund and a consultant to the Health Fund related to Colombo Member-1. Additionally, in October 2020, one of the victims of the scheme, the Labor Union's president (John Doe #1) was late to pay Vincent Ricciardo the monthly $2,600 extortion payment. Wiretap interceptions showed that Vincent Ricciardo wanted consigliere Ralph DiMatteo to accompany him to confront another captain in the Colombo crime family, whom Vincent Ricciardo believed was directing John Doe #1 and the consultant not to kick up money.

After DiMatteo told Vincent Ricciardo that he would not confront Colombo Member-1 with him, Vincent Ricciardo and DiMatteo took the matter to Russo for a decision. On October 16, 2020, at 1:37 p.m. (RD #758), DiMatteo placed a telephone call to Andrew Russo's daughter, whose phone line Russo used to communicate with other Colombo members. While waiting for Russo to come to the phone, DiMatteo and Vincent Ricciardo can be heard on the line discussing Colombo Member-1 and the consultant to the Health Fund. During that same conversation, when Russo got on the phone, DiMatteo told him, "Monday, nobody's around" and then said, "I'm probably gonna take a ride with him anyway … Just to see, just to see what's going on." After Russo responded in Italian, DiMatteo said, "I don't know yet. We're gonna go over it now." Russo ended the call by saying, "Take care of it. Come home. Just take care of it, but come home, come home."

Several hours later, at 3:52 p.m. (RD #764), Russo called DiMatteo back. During the telephone conversation, DiMatteo told Russo, "No, Monday I told you" and clarified, "Yeah, they're not ar-, he's not around." The conversation continued:

| | | |
|---|---|---|
| DIMATTEO: | | Everybody's in, everybody's got uh, is in touch, yeah. |
| RUSSO: | | Do you have an appointment? |
| DIMATTEO: | | Well, they do, yeah. Okay? |
| RUSSO: | | I'll talk to you, all right. We'll talk tomorrow? |

Again, Russo engaged in a coded conversation with DiMatteo to indicate that Vincent Ricciardo and Colombo Member-1 had an appointment about the dispute.

7

On November 7, 2020, wiretap interceptions and GPS data for cellphones showed that Vincent Ricciardo met with Russo and DiMatteo at a bakery in Carle Place, New York. During an intercepted call placed at 1:34 p.m. (RD #252), DiMatteo spoke with Colombo Member-1 before putting Russo (who was with DiMatteo) on the telephone.

| | |
|---|---|
| DIMATTEO: | Hey [first name] how are you? |
| MEMBER-1 | All right pal what are you doing? |
| DIMATTEO: | All right what's doing? How you feeling, everything good? |
| MEMBER-1: | Eh not really but I mean we're getting there. |
| DIMATTEO: | You feel all right? |
| MEMBER-1: | Yeah I'm all right. |
| DIMATTEO: | Hold on one second hold on [DiMatteo put Russo on the phone] |
| RUSSO: | What's up? You sick? |
| MEMBER-1: | No I'm good. |
| RUSSO: | Good, good our friend came, he just left, he waited I was hoping you were, you know, here, but um, I get a chance I'd like to see you. |
| MEMBER-1: | Okay, all right, um. |
| RUSSO: | Um, up to you. |
| MEMBER-1: | I'll pass by the house tomorrow in the morning? Tomorrow morning? |
| RUSSO: | Yea that's good. You want me to I dunno make another budel [ph] there. Should I have him with me? |
| MEMBER-1: | I dunno who it is that you want me to talk to. I dunno who it is. |
| RUSSO: | No it's uh, the guy that you told me, the guy that visited there the other day, you know? |

8

| | | |
|---|---|---|
| MEMBER-1: | | The guy, the guy I visited? |
| RUSSO: | | No he visited you. |
| DIMATTEO: | | Visited [John Doe #1's first name]. |
| RUSSO: | | [John Doe #1's first name]. |
| DIMATTEO: | | Visited [John Doe #1's first name]. |
| RUSSO: | | You don't know? |
| MEMBER-1: | | No, am I losing my fucking mind? |
| RUSSO: | | No, you're alright (laughing), we all losing our mind.  Is this Charlie I'm talking to? |
| MEMBER-1 | | Yea this is Charlie's brother (laughing) |
| RUSSO: | | Charlie, Charlie (laughing).  Where's my pen?  Look out.  Hey, que? I can't even talk you don't speak Italian.  The guy you told me to have him there to go see Mary and all that.  Came by spoke to-<br>… |

In this conversation, Russo referenced both his earlier, in-person meeting with Vincent Ricciardo ("our friend came, he just left, he waited I was hoping you were, you know, here") and indicated he (Russo) wished to meet with Colombo Member-1.  Russo appeared to believe that Colombo Member-1 had met with John Doe #1, which he had not, an unmistakable reference that Russo's meeting with Vincent Ricciardo and DiMatteo concerned the Labor Union and Health Fund, and that his call to Colombo Member-1 also concerned the same.

      Three days later, on November 10, 2020, Russo and other members of the Colombo family's leadership met at a roast beef restaurant in Brooklyn.  Law enforcement officers surveilling the meeting observed Russo and co-defendants Benjamin "Benji" Castellazzo (underboss), DiMatteo (consigliere), Ferrara (captain) and Vincent Ricciardo (captain) at the restaurant.  Two days later, on November 12, 2020, Colombo Member-1 informed DiMatteo that the consultant would not continue in his position with the Health Fund.  The following day, November 13, 2020, law enforcement agents observed DiMatteo, Colombo Member-1 and Joseph Panzarella (Andrew Russo's driver), meet at the Blue Bay Diner, in Flushing, New York, and overheard that their discussion involved the Health Fund and the consultant.

Another meeting between senior Colombo family members was then held on November 19, 2020, at Brennan & Carr. Surveillance by law enforcement again confirmed Russo's presence, along with Castellazzo, DiMatteo and Vincent Ricciardo, among others. Subsequent to these meetings, various co-conspirators discussed what had transpired at the roast beef restaurant and confirmed that during the meetings (where Russo was present and would have presided as boss), the amount that the family expected to profit from the extortion and embezzlement of the Labor Union and Health Fund was discussed in detail. For example, on April 13, 2021, Vincent Ricciardo recounted a conversation he had with those at the meeting (Castellazzo and DiMatteo): "I said you're forgetting the Roast Beef joint. You're going to split it up, ten ten ten in forties. Well wait, well what you got a lax of memory here. And I told you I don't want ten percent of my money. What the fuck is wrong with you people? And if you are not going to get none. What the fuck am I talking to you for. I am going to see this guy and bring it to him every month. When I see youse. What am I getting out of it?"

Again, on June 6, 2021, Vincent Ricciardo recounted an earlier meeting he had with consigliere DiMatteo, in which DiMatteo relayed Russo's instructions about the extortion of the Labor Union and Health Fund, including Russo's views on Colombo Member-1:

| | |
|---|---|
| V. RICCIARDO: | I got a call from Fredo [Ralph DiMatteo], to go out to Bellmore, I met him in the diner out there, this guy [Vincent Ricciardo makes number 1 hand signal, i.e., the boss Russo] is worried because [the consultant] quit. |
| CW: | And? … |
| V. RICCIARDO: | Ah, so what happened was ah, he said here's the story, you're not to tell anyone about the union except for me and [first name of Russo's son]. [First name of Russo's son] this guy's son [Ricciardo makes hand signal for number 1], I known [first name of Russo's son] a long time, I said I got no problem with that. He says yea, you don't have to tell nobody in Brooklyn, you just, if there's anything you need to let me know or know [first name of Russo's son] know. |
| CW: | This is Ralphie talking now, not, number one? |
| V. RICCIARDO: | No, this came from number one. |
| CW: | Oh, okay. |
| V. RICCIARDO: | 'Cause he thinks there's gonna be a trouble now. |

10

Later in the conversation, Vincent Ricciardo recounted Russo's concern about firing a relative of Colombo Member-1 from the Labor Union, and described Russo's belief that Colombo Member-1 and the relative were "rats," or were acting as law enforcement informants. Vincent Ricciardo noted Russo's son, whom the investigation and prior criminal cases have identified as a member of the Colombo crime family, was also present. Ricciardo stated: "He knows I'm going after him, he said well the old man said this, his father's his son, [Colombo Member-1], he thinks they're both rats." Ricciardo further described that Russo believed that the relative of Colombo Member-1 should not be fired from the Labor Union:

> V. RICCIARDO: I told them, I said the elections are in December, this kid is gonna lose the elections. Well, the old man don't want him fired. I said fine, when he loses the elections I'll make him a delegate. Who knows, he may not want it, because he'd have to take a big cut in pay to become a delegate. Just tell the old man I respect his wishes, and I will try, to give him his wish. But I guarantee you Ralph, you go back there right now, he'll forgot what he told you to tell me. He says you're probably right, but his son [first name of Russo's son] was there, [first name of Russo's son] knows, and [first name of Russo's son] told his father, let Vinny handle it. Cause I'm telling you right now Ralphie, youse are putting things in place that I can't do at the union well I'm walking away from it now. So make sure you tell that to the old man, make sure [first name of Russo's son] is there, I want [first name of Russo's son] to hear it. If I gotta meet [first name of Russo's son] tomorrow I'll meet him at his son's restaurant on Hempstead Turnpike. I got my own problems.

In addition, wire intercepts in the spring and summer of 2021 show multiple instances where co-defendants discussed meetings with Russo or direction that he provided in connection with the scheme to infiltrate the Labor Union. For example, on April 28, 2021, Vincent Ricciardo described to the CW and a Colombo family associate Russo's unhappiness with Colombo Member-1 having told DiMatteo that he had instructed a consultant not to pay Russo: "Oh no, he's dead now, he's finished, he told number three I told my son not to send money over there no more, I stopped it, he signed his own death certificate by saying that. And that old man wasn't happy either." Ricciardo then confirmed that "old man" was a reference to "number one," i.e., Russo.

11

      C.      Russo's Collection of Payments in June 2021

In June 2021, the CW provided Vincent Ricciardo $12,000 that was purportedly provided by a consultant to the Health Fund as a protection payment to allow certain employees not to retain their positions at the Labor Union and the Health Fund despite the Colombo crime family's bid for control. Vincent Ricciardo explained he would have to show the money to co-defendant and consigliere Ralph DiMatteo and Andrew Russo's son, who, as set forth above, Russo directed be Vincent Ricciardo's point of contact for the extortion:

| | |
|---|---|
| V. RICCIARDO: | That's very, very, very, very, very important, I'm gonna have to show this to them. |
| CW: | To who? |
| V. RICCIARDO: | Upstairs. |
| CW: | Who you gonna show it to? |
| V. RICCIARDO: | Number three, I got no choice, and, and [first name of Russo's son], number one's son. |

This reference to the involvement of Russo's son was not the first time that the investigation showed that Russo had engaged his son to collect money from the Health Fund on Russo's behalf. On May 13, 2021, Vincent Ricciardo and Uvino discussed the history of the Labor Union and the Colombo family, including that prior payments from the consultant were collected by the defendant's son:

| | |
|---|---|
| V. RICCIARDO: | Two and a half years ago. This year, this November is going to be three years. When I went in, almost three years ago, is when, we forced him, to start giving him the money, remember they told me in the diner to stop and back off. You don't know. |
| UVINO: | It went for about a year. |
| V. RICCIARDO: | No, it never went down wrong. I'm telling you they got four, five payments that's it. |
| | . . . |
| UVINO: | He wasn't picking it up, [first name of Russo's son] was getting it every month. [First name of Russo's son] picked it up every month. |

12

Later recordings from June 22 and 24, 2021, showed that Russo had directed the $12,000 not be returned: "No, no, no, the old man don't want you to give it back. The old man says he owes him more than that, that's got nothing to do with me."

Finally, on July 20, 2021, co-defendant Uvino recounted that, while Vincent Ricciardo was in North Carolina, Uvino met with Russo and discussed the scheme, including specifics about employee pay and planning:

> UVINO: I saw the old man the other day-
>
> CW: You saw which old man?
>
> UVINO: Andrew-
>
> CW: -oh Andrew-
>
> UVINO: So, I told him, I said, you know everything's going smooth . . .

Uvino then provided details to Russo on the takeover the Labor Union and Health Fund and further made statements about cutting salaries of various employees related to a health fund consultant, all of whom were viewed by the Colombo crime family as obstacles to their takeover plan.

\*   \*   \*

Collectively, the above-described conversations, among others, clearly evidence Russo's direct handling of Colombo family's infiltration and extortion of the Labor Union and Health Fund, his ability to act and speak through surrogates, and his determination to continue in collecting illicit funds through labor racketeering.

II.   The Defendant is a Danger to the Community, Including the Victims in this Case

The defendant is the head of a violent criminal organization who, once again, faces charges involving actual, long-running threats of violence directed toward multiple victims. The investigation showed that the Colombo family operated with a clear hierarchical structure in the charged schemes, with instructions from the top filtering down through DiMatteo, Ferrara and Castellazzo, and with information from lower members being reported back to Russo. The defendant sanctioned and oversaw, and profited from, the extortion of the Labor Union and the long-running plan to excise money meant to benefit union members and their families. Without a hierarchy, of which the defendant, as the boss, was the most crucial member, the mafia would not thrive or have survived to present day. Moreover, to detain as a danger to the community only those lower-level members who directly delivered threats to union officials (on behalf of and at the direction of superiors), and not the family's leadership (who rose to such ranks carrying out the family's dirty work years earlier) would unduly shield the most important members of the mafia. Further, given Russo's ability to act through others, and a bevy of surrogates ready to follow his directions

(including within his own blood family), the defendant (if released) would effectively be returned to unrestricted leadership of the enterprise.

As the Court is aware, the Colombo crime family is a dangerous criminal enterprise that uses violence, including murder and assault, to further its interests. The defendant's reference in his motion that Russo was not involved in such acts here does not withstand scrutiny. First, because of the significant monitoring of the case by law enforcement, threats of violence were interdicted. As the conversation between Vincent Ricciardo from April 28, 2021 indicated, such violence was discussed being directed toward Colombo Member-1, who was viewed as an obstacle to Russo and his co-defendants gaining total control of the Labor Union and its lucrative Health Fund. (See April 28, 2021 conversation, supra, in which Vincent Ricciardo explains Russo's unhappiness with Colombo Member-1 having told DiMatteo that he had instructed a consultant not to pay Russo: "Oh no, he's dead now, he's finished, he told number three I told my son not to send money over there no more, I stopped it, he signed his own death certificate by saying that. And that old man wasn't happy either."). Second, the defendant's argument overlooks the very real and clear threats of violence directed to John Doe #1 by Russo's underlings, and the significant pain and family toll experienced by a victim being extorted by a mafia organization. The defendant, after more than six decades in the Colombo crime family, understands better than anyone that handing over control of a labor union or making protection payments are not done out of the goodness of a victim's heart, but decisions made under real fear the defendant has devoted much of his life to fomenting.

Releasing the defendant on the terms proposed by defense counsel would return him to his home, from where he carried out much of the charged conduct, and give him the full resources of the Colombo crime family, including its violent members and associates. Russo will be able to continue to profit any time a member or associate commits a crime and to direct any of the various members and associates to carry out additional crimes.

Further, the defendant's proposed bail package and putatively restrictive bail conditions will have no actual effect on his conduct. The proposed monitoring of his home telephone line is meaningless given the bevy of cellular devices and encrypted messaging and telephone devices that could be provided to the defendant. Similarly, the restrictive visitor list is useless because the defendant uses family members to carry out his activities. As noted, his son is an inducted member of the Colombo crime family and he frequently used his daughter's telephone to speak on the phone, another effort to avoid detection by law enforcement. Further, endorsing the elaborate conditions of release proposed here, which amount to the reconstruction of a detention facility in the defendant's home, would run afoul of the precedent in the Second Circuit on the release of dangerous defendants. See United States v. Millan, 4 F.3d 1038, 1049 (2d Cir. 1993) ("Home detention and electronic monitoring 'at best elaborately replicate a detention facility without the confidence of security such a facility instills.'") (internal quotation marks and citation omitted). Here, the Court need not establish a precedent that an indisputably dangerousness defendant may be released where complex conditions of home incarceration can be imposed. See, e.g., United

14

States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility.").

Moreover, any agreement by the defendant to abide by conditions of release must be viewed skeptically in view of his prior conviction for conspiracy to commit jury tampering and obstruction of justice. See 98-CR-817 (E.D.N.Y.). That offense involved a trial of the defendant's son. As recounted by the Second Circuit, in affirming the defendant's conviction, Russo's conduct included arranging to keep one of his son's friends "in hiding while the FBI was looking for her." United States v. Russo, 302 F.3d 37, 40-41 (2d Cir. 2002) ("The evidence, briefly summarized, showed that Castranova had been hidden for over a year on a horse farm on Long Island owned by Hickey in order to avoid the FBI subpoena, and that both Russo and Hickey were involved in the plan to keep her concealed from the FBI."). Additionally, Russo's prior presentence investigation report notes that the witness Russo hid from investigators had provided Russo a juror's name in his son's murder and racketeering case, despite a court order that the jury was to remain anonymous.

III.    The Defendant's Health Conditions Are Not A Basis for Release

In view of the overwhelming evidence and his decades' long membership in the Colombo crime family, Russo's application primarily focuses the Court on various health issues faced by the defendant and the speculative claim that the Bureau of Prisons cannot adequately address such concerns. The defendant, like many individuals at his age, is afflicted with various, chronic health conditions. They are by no means a "death sentence" (Def. Motion at 2) for the defendant if he is detained. A thorough review of the defendant's medical treatment to date shows that he has received intensive, appropriate care from the Bureau of Prisons, first at the MDC and then at the various facilities where he has been treated.

To begin, the government understands that the Bureau of Prisons determined on October 8, 2021, after Russo had spent approximately three weeks at the MDC, that Russo should be transferred to a nursing facility (the "Nursing Facility") 

---

4

15



16

Case 1:21-cr-00466-HG-JRC    Document 126    Filed 10/26/21    Page 17 of 18 PageID #: 949



17



In sum, the voluminous medical records obtained by the government demonstrate that Russo is receiving more than adequate medical care. Defense counsel has lodged no specific accusations about shortfalls in his medical care, and in the time since Russo has filed his application for pretrial release, the medical records show that Russo has been appropriately evaluated and treated for his medical conditions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Confinement in a hospital or nursing setting would not just protect others in the community from Russo but would allow him to get the care and monitoring he may require.

V.   Conclusion

For all the reasons stated above, the government respectfully submits that Andrew Russo's application for bail should be denied and the permanent order of detention remain in effect.

<div style="text-align:right">
Respectfully submitted,

BREON PEACE  
United States Attorney
</div>

By:   /s/  
James P. McDonald  
Devon Lash  
Assistant U.S. Attorneys  
(718) 254-7000

cc:   Clerk of Court (ARR)  
Jeffrey Lichtman, Esq. (Counsel for the defendant)